Brady *v.* McBride.

PHILIP BRADY et al., appellants,

*v.*

MARY McBRIDE et al., respondents.

In February, 1876, a will was executed by a widow, who was then about eighty-two years old, and blind. In November, 1878, an inquisition of lunacy found that she was then of unsound mind, and had been so for three years preceding. Her testamentary capacity, at the time when her will was made, was, nevertheless, shown and established by the testimony of witnesses, and the orphans court decree ordering her will to be admitted to probate was affirmed.

Brady *v.* McBride.

Appeal from decree of Hudson orphans court, admitting to probate the will of Margaret Devine, deceased.

*Mr. F. McGee,* for appellants.

*Mr. J. Garrick* and *Mr. G. Collins,* for respondents.

THE ORDINARY.

This is an appeal from a decree of the orphans court of Hudson county, admitting to probate the will of Margaret Devine, deceased, late of that county. The testatrix was a widow. She had never had any children. By the will, which is dated and was made on February 24th, 1876, she gave to her brother, Matthew Brady, for life, a house and lot in Jersey City, then occupied by him (she lived with him at that time), with remainder in fee to his daughter, Margaret Conlon, her namesake, and gave to his other daughter, Mary McBride, the adjoining house and lot, called the Lohman property, in fee. She gave the residue of her estate to her brother Matthew, and appointed him executor. He predeceased her. She died in 1883. He died in September, 1878. The will was executed with all due legal formalities. It was drawn by Mr. Garrick, a lawyer of Jersey City, who also superintended its execution, and was one of the witnesses. The testatrix was blind, and was probably about eighty-two or eighty-three years old. It appears, by Mr. Garrick's testimony, that he drew a will for her in 1874, the instructions for which he received from Matthew, with whom she was then living, but it was not signed. After the draft of it was made, Matthew told Mr. Garrick that he need not call in reference to it until he should be sent for. In February, 1876, shortly before the execution of the will in dispute, Mr. Garrick was sent for to go to the house of Matthew to see the testatrix. He went there and took with him the draft of the will of 1874. That paper gave to Mary McBride the Lohman house and lot, in fee, and all the residue to Matthew. It appointed Thomas Fitzimmons and Mary McBride's husband, executors. The testatrix, after Mr. Garrick's arrival at the house, gave him

directions to draw the will. It was to differ from the draft of 1874. He took a memorandum of those differences, and then went to his office and made a draft of the will, and had it copied. The next day, or a very few days after he received the instructions, he took the copy to the house, read it over to the testatrix, and asked her if it was correct, and she said it was, and that she was ready to sign it. He says that when he received his instructions from her, he read the draft of 1874, and explained it to her in language that he thought she would understand, because there were some technical words in it; that because she was blind he was very careful to explain it to her thoroughly; that he used "homely" language to her so that she would understand, and that she told him herself what changes she wanted to have made. He further says that she satisfied him that she knew the exact nature of the business—that she thoroughly understood what she was doing. He further says on the same subject, speaking more particularly, that he read the paper of 1874 to her, and explained each clause to her—explained the meaning of it; that he told her that that paper gave the Lohman house and lot to Mary McBride absolutely, and that the next clause gave the other house and lot to Matthew absolutely, and he says she then said she would like to have the latter property go to Margaret after her father's death; that he then spoke of the residuary clause, and he thinks it was read, and he told her it would cover anything else there might be, money in bank and personal property, and she said that that was to go to Matthew. He also says that she was at his office two or three times on other business—in reference to her deceased husband's estate—and that the first time she came was before the will was made.

As before stated, Matthew died in September, 1878. In October of that year a commission of lunacy was, on the application of Mrs. McBride, issued out of the court of chancery, under which, on the 12th of November following, there was an inquisition, by which it was found that the testatrix was of unsound mind, and had been so for the three years next preceding and upwards.

The testimony in reference to her testamentary capacity at the

time of making the will is conflicting, but the preponderance of it is in favor of her competency. In addition to the evidence of Mr. Garrick, already spoken of, as to what occurred in the conversation between him and her at the time when he took her instructions for the will, there is other evidence in the testimony of Mrs. Conlon of her intelligent action in the matter. That witness says the testatrix requested Matthew to send for Mr. Garrick to draw her will; that the testatrix asked Matthew who drew up her husband's will, and he answered that it was Mr. Garrick, and she said she would like to see him, that she would like to make her will, too; that Matthew said it was time enough, and she replied that it would not cause her to die any sooner, and that she liked to get things off her mind and to have things settled. Matthew then promised to send Mr. Garrick to her, but did not do so until two or three days afterwards. Dr. O'Callaghan attended her about 1877 every day for about a fortnight. She had an inflamed eye. He says she told him her symptoms and explained them satisfactorily, and that at the close of his attendance she settled with him as patients usually do; that he and she reckoned up the number of visits and he stated the charge for each visit; that she endeavored to get him to take less than his regular charge, and that he found her very close and penurious in the payment of bills. He also says that at that time he thought she exercised all her mental faculties reasonably, and that he saw nothing about her at all to lead him to think that she was in any way insane or demented, and that he is very well satisfied that she was sound in mind. Five years afterwards he attended her, and he says she was not insane or demented even then; that she was able to talk and converse then, but was very old and feeble. He adds that he saw nothing wrong about her mind and that he thinks that even then she had testamentary capacity. Patrick McNulty, one of the executors of her husband, testifies that in 1874 or 1875, he thinks it was the latter year, he took $100 to her from his co-executor, Mr. Layatt; that he went to her room and she requested all others present to withdraw from the room, and that she then shut the door and said to him that she wished him to keep the

larger portion of the money and give it to her as she should want it. He says she said her reason was that she would avoid the requests of the young people about her for gifts of money. When he asked her how they would know that she had the money, she answered that she was blind, but they could see where she put her money at any time; that she would have to show them what money she had. She took only $5 out of the $100 and he retained the rest for her, and gave it to her as she wanted it afterwards through about six months, in payments of $10, $20 and $25. The arrangement between them was that he was to call there every week, but he did not call so frequently. He said that when he called she talked to him on her business; that from the conversation he had with her and his knowledge of her, he had no idea, in 1876, but that she was as sound in mind as he himself was; that she always talked as sensibly to him as she did before she lost her sight. Mr. Layatt, his co-executor before mentioned, did business with her personally in 1874 and 1875, and he thinks in 1876. He says that she objected so much to his management of affairs (his expenditures for repairs &c.), that he was unwilling to go and see her any more, and that the last money he paid her he paid in 1878 through Mr. Fitzsimmons, who lived in the same house in which she lived, and who got her receipt for him therefor. He says he never looked upon her as being " crazy in any way, manner or shape," and that she was as sound in mind the last time he saw her as ever. Hugh O'Reilly saw her very frequently during the last two or three years before Matthew died, which was in 1878. He says she was mentally very smart and shrewd and had a good memory. Thomas Aldridge saw her in 1877 and had conversations with her on business at his office, to which she came. He says he saw nothing to indicate any unsoundness of mind.

Opposed to this testimony on the part of the proponents, is that produced by the caveators, consisting of the opinions of non-expert witnesses as to her competency, with the results of their observation of her mental condition. Their evidence is not such as to counteract the testimony of the witnesses who have testified to her capacity, and whose opportunities for observation were

quite as good, at least, and their intelligence as great as that of those of the witnesses on the part of the caveators who have testified to the contrary. The application in lunacy was not made until November, 1878 (after Matthew's death), nearly three years after the will was made. The finding of the jury that the lunacy had existed for three years, is not conclusive. Any presumption which it raises is rebutted by the proof that the testatrix had testamentary capacity at the time of the making of the will.

The proof shows that there was great affection between the testatrix and Matthew, so great that his death appears to have overthrown her reason. He not only cared for her tenderly while he lived, but made her welfare the subject of special charge on his death-bed, to his daughter, Mrs. McBride, exacting from her a promise that, come what might, she would always take care of his blind sister. He brought the testatrix from her house in another part of the city to his own, in order that she might live there, in his family, and there is great reason to believe that he did it merely out of affection for her, and because she was not properly cared for at home, but was neglected, if not entirely deserted, by the nephew and niece on whom she relied for care and attention, and whom she had herself brought over from Ireland to live with her. There is no proof of fraud on the part of Matthew or his family to procure the testamentary disposition of her property in his or their favor. On the other hand, it seems that the will which was drawn in 1874, though it gave all her property except the Lohman house, to Matthew, was never executed, and when, in 1876, she proposed to make a will, Matthew endeavored to dissuade her from it, by saying that there was time enough for that. The will of 1876 was less favorable to him than the proposed will of 1874, because it gave him only a life-estate instead of a fee in the property on which he lived. When the circumstances and relations of the testatrix and the beneficiaries under the will are considered, the will must be regarded as a very natural one.

The order of the orphans court should be affirmed. The costs of the appeal, with a counsel fee of $150 to the counsel of each side, will be paid out of the estate.